We have this lighting system in which when the yellow light comes on, that means you have two minutes to complete your argument. And I think you have the time on the other side of the podium that will tell you that as well. And when you come to the red light, we expect you to bring your argument to a close at that point. These arguments are being recorded today for the purpose of assisting us in writing any opinions that come out of these proceedings. And also, they are available to the public, your argument is, so you need to do your very best. And finally, I would mention to you that rebuttal is for rebuttal only, and we don't expect you to bring up any matters in rebuttal that have not previously been addressed, either by you or your opponent. We'll call the first case of the day, and that's United States of America v. Rodriguez and several others. And we will first hear from Mr. Davis, who is representing Mr. Rodriguez. Good morning, Your Honor. Good morning, Your Honor. My name is Neil Davis, and I represent Francisco Rodriguez. My argument challenges the sufficiency of the evidence to support the conspiracy conviction against Mr. Rodriguez. I understand that I have a very high standard to meet in manifest miscarriage of justice, and the evidence must be considered in light most favorable to the government. The government has correctly stated that Mr. Rodriguez was at Maria's apartment the night of the takedown and that he fled during the police takedown. However, the government asserts that Mr. Rodriguez was part of the conspiracy for two reasons. He was at the apartment and he took part in the discussion of the robbery and that while he was fleeing, he dropped a police t-shirt. As far as A is concerned, he was at the apartment, and Bonilla, who was a co-defendant, Ms. Bonilla, who was a co-defendant, said that she testified that she saw Mr. Rodriguez at the apartment with the others, and that was the first time she had seen him. But Ms. Bonilla was in a back bedroom watching TV with her children. She came in and out of that room and heard snippets of the conversation, and at one point she even went to the store. I believe the evidence is tenuous because it did not show that Mr. Rodriguez specifically understood or had knowledge of the robbery. Bonilla also testified about the police t-shirt. She said that Mr. Rodriguez was one of several people who were modeling the t-shirt. But both Farley and Gonzales… Who were modeling it? They were modeling it. Yes, Your Honor. Ms. Bonilla said that there were police t-shirts there and that some of the participants, some of the people who were going to be in the robbery were modeling these t-shirts and looking at each other. Well, Judge, both Farley and Gonzales, who were police officers at the takedown and who testified and saw Mr. Rodriguez as he was fleeing from a canine unit, said that all they saw was him shedding a jacket as he was trying to flee. Mr. Gonzales, or Officer Gonzales, said he didn't even remember the color of the t-shirt, and Farley, I believe, said that all he saw was Mr. Rodriguez… What kind of jacket was it he was trying to… It was a black leather jacket, Your Honor. Why was he trying to get out of that? Excuse me? Why was he trying to get out of his jacket? He was shedding his jacket, Your Honor. I'm sure he could have run faster, I guess. That was a fact I can't change. All right. This case, as I pointed out in my brief, is like Carrasco, I think. In Carrasco, Valdez, who was the defendant who this court said had insufficient evidence for a conviction, he heard, overheard a statement by an affirmed co-defendant concerning the conspiracy, and in that it was a conspiracy for drugs. And there was even testimony that Valdez was carrying three or four suitcases full of marijuana. However, this court said that there was not enough information, that Valdez was not privy to the conversation, and therefore the evidence was sufficient in that case. Your Honor, each of the cases relied upon by the government reveals that there is some further circumstance or some other piece of evidence from which a jury would reasonably infer specific knowledge and willful participation. In this case, I believe there is not enough. Thank you very much, Mr. Davis. Mr. Williams, we'll hear from you representing Mr. Rivera-Otero. Yes, Your Honor. My oral argument focuses on the sentencing issue. In my opinion, this is where reason and logic butt heads with justice in this case. I didn't have the benefit of the USAV Randall case when I wrote my brief, and to be honest with you, I didn't catch the other cases until it was too late to file a responding brief. However, in our case, there were never any drugs ever at all, and in the Randall case, there were drugs, and the Fifth Circuit said that, well, even though the conspiracy was five or more kilos imposing the mandatory minimum, the fact that these gentlemen in Randall handled less than five kilos meant that they would get a sentence below the mandatory minimum, even though they fled to it. The Daniels case is similar to our case in that they went to trial in that case and they were found guilty of five or more kilos of cocaine and, I think, crack cocaine. But the same thing happened there, and this court remanded it for resentencing to find out exactly how many kilos each defendant was actually responsible for. The problem we have here is there never was any drugs. There never was anything for anybody to be responsible for because the drugs didn't exist. My main complaint at the sentencing hearing was the sentence was much, much too harsh considering there was no drugs. And the other part was— What kind of sentence did your client get? 411 months. 411 months. That is a stiff sentence. It's monstrous. But the two charges, counts one and count two, he got 327 months because the court found—because the agent said there were 30 kilos in the house. So that's what bumped his sentence up. If he had not said that, if there had been a lesser amount, then his sentence would have gone down dramatically. So I guess my question is let's say they decided to raid a house and there was only three kilos in the house, and they conspired to go into the house and let's get the three kilos, and then they go in and they find there's 20 kilos. Well, a conspiracy would be for three kilos, but there turned out to be 20, and let's say they all got arrested before it happened. Are they going to be responsible for three kilos or 20 kilos? In this case, how do you find out what they're actually responsible for? So under Randall, Daniels, Beharda, and the other cases on the Fifth Circuit, it should be remanded for resentencing to make a determination of what it should be. But, I mean, I guess they tagged him with all that because he's part of a conspiracy and he's liable for the conduct of his co-conspirators. That's correct, and that's exactly what Randall says. Even though the conspiracy says five kilos, their participation was less than five kilos, and the Fifth Circuit said they should be only responsible for what they had. My time is up, Judge. Okay, you present an interesting question there, Mr. Williams. We'll hear from Mr. Purcell now, representing Mr. Borough. May it please the Court, John Purcell for Mr. Borough. The issue presented in our brief is whether the district court improperly denied Mr. Borough the opportunity to present his defense of entrapment to the jury by denying his request of jury instruction. And that request is reviewed with all the evidence being viewed in the light most favorable to the defendant. And in this case, when the evidence is viewed in the light most favorable, and all the evidence and all the inferences that could be drawn from it are viewed in the light most favorable to Mr. Borough, the district court did err by not granting his request of instruction. Entrapment has two prongs. First, obviously, inducement. Second, predisposition. From the government's brief, I take it that the inducement is the main issue here. The courts, though, have said that – this court has said that inducement exists where the government materially alters the risk or rewards of a particular offense. And this case is not a run-of-the-mill drug case. Mr. Borough was convicted of drug trafficking and possession of firearms in connection with drug trafficking. But the way that it was presented by the agents in the sting was not a run-of-the-mill drug case where we said, hey, we have some cocaine. We can front you the cocaine. You can go sell it. It wasn't that kind of case. It was a, hey, here's 25, 30, possibly 40 kilos of cocaine that if you go to this house and get it, you'll never have to – you'll never lose any profit. You're not getting fronted the cocaine. You won't be caught for stealing it because it's obviously – drug traffickers don't call the police. But just by the nature of the sting, they altered the risk and rewards of the offense because they made the drug trafficking much more profitable. And also – But was he predisposed to engaging in the act of a criminal enterprise? I believe that the government's argument is that there was no hesitation, but this court in United States of the Nation stated that – and that side didn't agree – stated that the defendant doesn't have to hesitate to not be predisposed, and that's not the test. And also there's no evidence of Mr. Borough engaged in prior drug trafficking. So there was no evidence that he was engaged in this kind of behavior before the agents presented the opportunity. Okay. Thank you, sir. And we will hear from Ms. Wood, representing Carl Bala-Diaz. May it please the court. There are two main issues related to my client in front of the court today. The first issue is whether or not the United States District Court for the Southern District of Texas correctly denied the motion to compel the disclosure of a confidential informant. The second issue is whether or not the court abused its discretion by failing to hold an in-camera hearing to determine the necessity of disclosing the confidential informant. The Supreme Court has held that the confidential informant – the disclosure of a confidential informant is mandated when the government's interest in confidentiality is outweighed by the defendant's need for disclosure. But the confidential informant here played a very minor role, correct? According to the government, Your Honor, we actually contend that he played a – more than a minor role. Our contention, starting with the first rebarrio factor, which is the level of participation, is that he had some type of rapport with the appellants. The reason we can infer that is because he not – the confidential informant introduced him to the undercover agent, which was – who introduced him to the confidential – our undercover agent in order to commit this crime. Essentially, he wasn't just a mere tipster. He didn't just call the agent and say, hey, I know that these guys want to rob a stash house. He had more than just an innocent bystander position. But the crux of our argument is actually the second factor, which is the helpfulness of the confidential informant with – to the – to any assertive defense. And our defense is that the confidential informant, as an agent of the government, was who induced our client to participate in this robbing of the stash house. Now, the government suggests that there's recordings of the meetings with the undercover agent, and those by themselves show that we were predisposed. But the problem with that is that it's only a snapshot in time. Our client and the confidential informant had conversations prior to meeting the undercover agent. And those conversations, we believe, the confidential informant induced him by calling him multiple times, by encouraging him to meet the undercover agent and to perform the robbing of the stash house. And because of this, the only two people that can be witnesses to these conversations are the appellants, who have pled the fifth, and the confidential informant. So at this point, we have no recourse for determining what the confidential informant would say as to how he got them to meet with the undercover agent. As to the third prong, which is the government's interest in nondisclosure, the government suggests that the defendants have a display of willingness to engage in violent crimes, and other unidentified cohorts are free at large. But I believe that's kind of a blanket statement and that an in-camera hearing would have provided the protections that the government requires. For these reasons and the reasons in the brief, we ask that you find that the lower court abuse their discretion. Thank you, Ms. Wood. We'll hear from Mr. Aguilar, representing Mr. Lewis. My name is Frank Aguilar. I'm here for Eric Lewis. There were four issues that were raising our appeal, and I'd like to address two of those. The first one being whether or not there was reversible error per se in the constructive amendment of the indictment. The indictment alleged that – or charged my client with aiding and abetting the attempted possession of a controlled substance. Whereas the jury instructions charged aiding and abetting possession of a controlled substance. Those are two completely separate offenses. One of them, the one he was indicted with, does not require that the defendant have possession of a controlled substance. Whereas the second one, the one that was included in the jury instructions, it does require a finding by the jury that someone actually possessed a controlled substance. And as we know, this was a fictitious stash house robbery. There were no real drugs, so there's no evidence that anyone actually possessed a controlled substance during the course of this robbery. I mean, the barrier or bar to the argument that you're making is that the district court corrected its error by repeatedly saying what the indictment did say, actually said. Isn't that correct? I'm sorry. Are you stating that the district court corrected itself by repeating what the indictment said? Yes. Isn't that true? I mean, that's what I read in the briefs. Judge, I would disagree with that. I believe that the jury instructions were controlled over what the judge may have been saying. I mean, that's what the jury takes back. That's what they look at when they're instructed to read those instructions. But don't you take the instructions as a whole, and it wasn't cleared out in any of the instructions? When you read all the instructions together, don't you get the proper law? Well, there was a statement as to what was pled in the indictment in the jury instructions. But then the actual instructions told the jury that in order to find the defendant guilty, you have to find that there was possession of a controlled substance. And the other reason I think this is important— Did you make an objection to that at the time? No, Judge, not at the time. None of us caught that error.  Well, Judge, where the difference between the two offenses is such that you actually charge a defendant with a new offense, then it's irreversible error per se. Now, addressing whether this was plain error, Judge, I believe there was a constructive amendment. And the reason that this court should not dismiss this error by concluding that this was harmless error is that it involved some very valuable constitutional rights of the defendant. In the Fifth Amendment, he's guaranteed the right to a grand jury indictment. On the Sixth Amendment, he's guaranteed the right to notice the charges against him. And those two things did not happen here because of the constructive amendment that took place in this case. The other issue that I would like to address is the lack of the entrapment instruction. My client in this case stood aside for about 22 minutes apart from where everybody was planning this robbery. And while it was contended that my client was an enthusiastic participant, while that may be true of some of the other defendants in this case, that was not true of my client. Because he clearly demonstrated he was not interested in engaging in this crime. Because when he went there, he only went there to give somebody a ride. And he stayed by his car. Your client had no criminal record? He had no criminal record. No previous experience? Not at all. Okay. Thank you, Mr. Aguilar. Now we'll hear from the government, Mr. Shanko. You're from the Department of Justice, correct? Good morning. Thank you. May it please the Court. You're not an Assistant United States Attorney, right? I'm not. I'm from Maine Justice, Your Honor. We're glad to have you here. Thank you. Your Honors, I actually have no affirmative points to make. I believe the government's brief adequately responds to all of the arguments my colleagues made. But I'm obviously more than happy to answer any of the Court's questions. No.  So if you came down to New Orleans, you— I had a good meal, Your Honor. I'm troubled about the failure to give an instruction on the entrapment, particularly with respect to Mr. Lewis, since he was completely without any experience, no criminal record. Yes, Your Honor. Why wasn't that reversible there, not to give the entrapment instruction? Well, Your Honor, the lack of a criminal record is certainly one factor to consider, for the Court to have considered, with respect to predisposition. But even assuming—and that's what the District Court did here. It assumed a lack of predisposition and said that there was no government inducement. This Court and others have repeatedly held that the simple setting up of a reverse sting, such as the one here, does not constitute inducement for entrapment purposes. Now, the facts here show that although Mr. Lewis stood apart from the group for 22 minutes, that was during the planning of the act of un-invasion. And it's accepted by everyone that Mr. Lewis was not going to participate in the home invasion itself because he was a getaway driver, and he said that himself. Now, when presented with the opportunity by Agent Zayas, Mr. Lewis did not hesitate. He joined the group quite promptly. He then made several comments suggesting that he was interested in participating. He said that everything is coming out, which we took to mean, and I think the jury could infer to mean that we're going to get all of the drugs. He said the stash house guards will be led to believe that there are other police officers outside. He told Agent Zayas not to be nervous. And he asked for the stash house address twice in two separate meetings so that he could enter it into his GPS because, again, he was the getaway driver. I'll also add that he was at the October 26th meeting when the robbery, which was supposed to go forward that night, did not go forward. He then returned six weeks later and was at both the December 2nd pre-meeting at Mr. Boria's apartment and then the December 2nd meeting when the robbery was supposed to take place. If, as he alleges, he was induced or he was hesitant or he was afraid at the October 26th meeting, he had plenty of time to withdraw from the conspiracy at that point before the December 2nd meeting. But, of course, he came to the December 2nd meeting and was ready to participate at that point. How did he get involved in the first place? Who brought him into the conspiracy? Mr. Rivera-Otero was his friend, and he brought him into the conspiracy. And we don't deny that. Mr. Rivera-Otero received a sentence in Manhattan. Now, Otero, was he in the drug trafficking business? I believe, Your Honor, he did have a prior conviction, a drug-related conviction, I believe. Now, is Otero the one that received the $400,000? Yes, that's right. All right. Now, what about the Randall case? What do you have to—I mean, it does seem like—see, the government could have charged— I mean, could have raised this conspiracy for 100 pounds of cocaine, and everybody that was involved in it would have, you know, had a sentence that would go through the heavens. I mean, it would have been so high. Right. I mean, it just seems like to me that there's something wrong when the government can determine the kind of sentences that the defendants get based upon fictional conjuring. They just conjure up all these unrealistic, unsupported allegations and stick the defendants with it. I mean, that just doesn't sound right to me. Your Honor, I have two answers to that with respect. One is pragmatic and one is precedent-based. Precedent-based first, this court said in the Burke case, which we cited in our brief, we hold that a sentence for drug conspiracy may be based on fake drugs. Indeed, in convictions based on reverse sting operations, where the actual quantity of drugs is controlled by the government instead of by the defendant, the quantity of drugs agreed upon more accurately reflects the scale of the offense than the quantity actually delivered. That's this court's own holding in the Burke case cited in our brief on page 55. Now, more pragmatically— I mean, that doesn't make it sound any more right to me, though. Well, Your Honor, in terms of the government's incentives here, the government does have an incentive to make the quantity of drugs reflect a realistic and reasonable amount for that locality, and there was testimony in this case both at trial and at sentence. According to the defendants, though, it triggers mandatory minimums. It stacks the decks against defendants when the government has complete control over saying what amount it is. They could have gone with a much lower amount. And some of these players, Lewis, for example, might have been willing to join into the conspiracy if not to net $1.5 million but to net $500,000. I think some of the testimony said about how much they might net out of it. And with these minor players being people who want some money, I guess, why should the government create something that is stacked so high against the citizens? Well, Your Honor, the defendant, respectfully, always has the opportunity to back out. And as the drug quantity increases— And the government always has the opportunity to say that it's $1 million or it's 500,000 pounds of cocaine in this area. But, Your Honor, as I mentioned, the government does not have an incentive to do that for two reasons. One, it's an unrealistic proposition. These defendants, generally speaking, and I think in this case too, who have demonstrated a familiarity with these types of operations and a history with these types of operations. One might say, that's just not real. What stash house in Houston is keeping a million pounds of cocaine in there or a million dollars' worth of cocaine? This looks fishy to me. Number two, a defendant might have—one would expect— that argument, to me, does not answer the problem that at least Judge Reeves and I are having with it. And that is you could have said 25 pounds. It would have been realistic. You could have said 35 pounds and it would be realistic. And it still could have shot up sentences within what you may say is within the market credibility area and still control their sentences and, you know, send them to jail for a lot longer than they might have otherwise gone. It just—tell me about this Randall case. I mean, I— Your Honor, I don't think Randall does anything more than say that the drug quantity is based on the conspiracy that the defendants actually agreed to. I don't see it as being anything more than that. And we agree with that. What did Randall do? Remanded the case for reconsideration. Yes, Your Honor, because there was no real consideration of what each defendant was actually considering being involved with. Well, is there here? There is, Your Honor. With respect to Mr. Roberto Otero, who is the only defendant making a sentencing claim or sentencing entrapment claim, the district court here went on at length about what he was considering, what he was—the conspiracy that he was involved in. The amount of drugs here was represented to all of these defendants numerous times, and they had the opportunity to back out. They had the opportunity to say, that's too rich for my blood. This is not something I want to get involved in. But they didn't say any of that. And this court and multiple other courts have upheld these types of reverse things where the government sets the quantity of drugs. Well, I mean, as you know, I think the courts are generally concerned about the fact that the tail—not to refer to prosecutors as the tail of any animal in any other way—is wagging the dog here. And that's just—the judge is being the dog, supposed to set the sentences or have the sentencing responsibilities. But yet they are set by the prosecutor. And that's just an anomaly, and it is—it borders on being offensive. Your Honor, I don't think the problem that we have here to the extent the court sees the problem is unique to this type of situation. In any type of sting operation or reverse sting operation, even a hand-to-hand sting operation, a firearm sting operation, the government is always in control of the operation ultimately. And courts have repeatedly held that such reverse sting— I know. Okay. It sounds like you've backed up into a point where you must address the other defendant's argument about the failure of the court to look into or disclose or have a hearing on the confidential informant. Why these particular defendants—you say they had some knowledge about stash houses and things like this. So doesn't it make it more likely that the court ought to delve into how the government was tipped off on these particular individuals through this CI? What this CI knew? When did the CI know it? Why the CI thought that these were the defendants who you should monitor and look at? And raises a whole host of questions that could have been dealt with in camera, and then the court could have determined whether or not that information should be disclosed. Your Honor, the cases demonstrate that there has to be something in the record, the existing record, that suggests that the CI played a larger role. Something suggests that he might have induced the defendants or something like that. I mean, the only thing we know is that the government testified that there was one contact between the government agent and the CI. Well, we know that, but we know more than that, Your Honor. What else do we know? We know that from the absence of things, which is no defendant here said to Agent Zayas, hey, your buddy told me I was going to get X, Y, and Z. Where's X, Y, and Z? No defendant said, hey, your friend who put us in touch kept telling me to come here, so here I am. What do you have for me? No defendant said, I've never been involved in anything like this before, but your buddy told me that there's a lot here, so what's going on? We don't have any of that. We have defendants showing an expertise in this area, which is exactly what Agent Zayas testified to, that the government was aware of this group that was interested in conducting these robberies, and that's exactly what the transcripts show. These defendants came to these meetings saying we know how to do this. This is how we're going to do it. We're going to get firearms. We're going to tie up the stash house occupants. Don't worry. Don't be nervous. All of that. There's nothing to show that the confidential informant here cajoled these defendants or bribed them or anything like that. What prejudice would the government have suffered if the in-camera hearing was ailed? I'm sorry? Would the government have suffered any prejudice if the in-camera hearing was ailed? Presumably not, Your Honor, but it's up to the district court's discretion, and it's wide discretion whether to hold a hearing, and it's also an abuse of discretion standard whether to disclose the identity of the confidential informant. And when the defendants have come forward with nothing but speculation, and this court has said that even when the defendants are raising an entrapment claim, speculation about what the confidential informant might have known or might have said is simply not enough. There's just nothing in the record here to suggest that the confidential did anything more than identify this group to the government and arrange the first meeting. And I would submit that the defendants have not even come forward with allegations that the confidential informant did anything more than that. Just speculation. Okay, Mr. Shanko, thank you for your argument. Thank you. Yes, sir. Mr. Davis, you've saved—no, I mean Mr. Williams, you've saved some time for rebuttal. Just a couple of things. Very quickly, these fellows weren't—even though they talked big talk, they were dummies. They were idiots. The original Stash House robbery was supposed to go down I think on October 22nd, but they were so dumb they couldn't even get themselves together with guns and the people. I think a couple of drivers showed up late. They had no idea what they were doing. The second thing that I want to remind the court is in Randolph— what is the point that I'm supposed to get from that argument? Well, I'm just arguing what the government has said, that they knew what they were doing. They did not know what they were doing. They were not masters, you know, Stash House robbers. But the main point I want to remind the court is Randolph didn't say the convictions couldn't stand. Randolph, Daniels, Guajardo, and the other case were all remanded for resentencing. And all of those cases said the conspiracy convictions stand, and it's the resentencing that has to go back to the court for resentencing, not for overturning the conviction. And that's what I'm asking for from Mr. Rivera. Okay, Mr. Williams, we'll surely take a careful look at that. Mr. Fazio? Just briefly, I want to respond to two points. This is the entrapment instruction issue. First was that the government stated in its argument that the setting up of the opportunity to commit the offense is not improper inducement. This case is distinguishable, though, from the run-of-the-mill case where it's the government just offers an opportunity. This was a case where not only did they offer the opportunity to commit the offense, they made it more financially rewarding because of the fact that they were not having to take drugs on credit from the suppliers and things like that. So the government's scheme, it altered the balance of risk and rewards of the offense. And second, the fact that when all the evidence is viewed in the light most favorable to the defendants, the fact that they bragged about being ready and able to do this cannot preclude the entrapment instruction. It just could be viewed as them bragging in an effort to gain the agent's trust so they could get this job and potentially make the $1.5 million. But part of the risk that they were willing to engage in was to put their lives in danger, right? Because they don't know who's on the inside of the stash house and who has what to fight them off, right? Well, the agent consistently told them there were only two drug traffickers in the house and only one of them had a firearm. So the agent, when he explained the operation to them, was very clear about the risk that they would be taking, the physical risk. Okay, thank you. Okay, Ms. Wood, you have a minute. In response to the government's point that there is just speculation and that's not enough to warrant an MRAC hearing, the point is that we can only speculate. We have no ability to do anything more than speculate because we don't know who the confidential informant is. We have guesses. And we don't know what his testimony is going to be. And this could easily be remedied by the in-camera hearing, which the government suggested would not have caused them any issues. Okay, Ms. Wood. Mr. Aguilar. The government contended or just stated that there was evidence of predisposition because my client, Eric Lewis, apparently stated that everything was coming out of the stash house, that they're going to think that there's more police outside, and that he was going to put the address into his GPS. But the point in time that we need to focus on in determining predisposition is whether the defendant was predisposed or inclined to commit this crime before there's any government intervention. And all these points that were raised by the government to support that my client was predisposed all happened after the government intervention, after Agent Zias walked over there to my client's car to bring him into the conspiracy. I just want to point out that the focus should be at that point in time whether or not he was predisposed to commit this offense. Okay, Mr. Aguilar. Mrs. Davis, Williams, Frisell, and Aguilar, you were all court appointed, and the court expresses its appreciation for your services. We'll call the next case of the day, and that's United States of America v. Delgado.